Allen, J.
Several objections have been taken to the proceedings and judgment. The first grows out of the pleadings. The defendants tendered a plea under the statute of 1831, to the filing of which the plaintiff objected, on two grounds; 1. because no proferí was made of the lease described in the plea, and 2. because it set up two distinct and independent matters of defence. An objection to the filing of a plea brings to the notice of the court such matters only as could be taken advantage of on general demurrer. The lease was not averred to be under seal; and if it had been, the failure to make proferí was cause of special demurrer. So in regard to the alleged duplicity of the plea,—if both matters relied on constituted a full defence to the action, a general demurrer admitting them to be true, could not have been sustained; and if, upon the replication, one of the grounds relied on in the plea did not constitute a bar to the action, the court on motion would have instructed the jury to disregard it. And such in fact was the case in the present instance. The third instruction asked for and given, applied to so much of the plea as set out the reentry of the landlord. The objections, both, go to the form, rather than to the substance of the plea, and were properly overruled.
*601 The important question is, whether, under the circumstances oí this case, the tenant was absolved irom the payment of the rent accruing after the destruction of the demised premises by fire. The principle of law, that where a tenant covenants generally to pay the rent, he is not absolved, though the premises be destroyed by fire, has been long established, and may now be considered as settled. The hardship is more apparent than real, and the rule maybe vindicated upon considerations both of justice and good policy. But, in all such cases, the rights and liabilities of the parties are to be ascertained from the terms of their contract. If there is nothing to take the case out of the operation of the general rule, it must govern, notwithstanding its supposed rigour in particular instances. But the intention of the parties, as deduced from their contract, where it contravenes no settled rule of law, must govern. And as the contract, in the case before us, is somewhat peculiar in its terms, the reported cases can furnish us but little aid, in arriving at the true meaning and intention of the parties. The clause under which the controversy arises, provided, “ That the tenant was to keep up the repairs of the mills, except heavy repairs, such as if the dam or forebay should be injured by high, water, or if the main shaft or wheel should give way, so as to require a new one, in this case it was to be repaired by the landlord in a reasonable time after such breach, and he was not to lose the rent if he should go on to do the work according to contract.”
The title of the landlord to rent is founded on the presumption that the tenant enjoys the thing rented during the term. Gilbert on Rents, Law Library, vol. 20. p. 59. This is the universal understanding of the country. In the present case, mills, with a storehouse and garden, were leased. Both parties looked to the profits to be made from the use of the mills alone, as furnishing the tenant with a support and the means of *602 paying the rent. Their contract may he somewhat obscure, but this obscurity is increased, as it seems to me, in attempting to elucidate it by adjudged cases on the effect of covenants to repair and rebuild. Keeping in view the fundamental principle, in the contemplation of these parties when they contracted, that the title to rent is founded on the presumption of enjoying the thing rented, their meaning is clear. The light repairs, of almost daily necessity in machinery of this kind, could be made frequently in a few minutes, and without materially or at all impairing the use and enjoyment of the premises. These the tenant was to make. The “heavy repairs,” of the character designated, might not be required during the term : the substantial parts of the machinery would rarely require them. But property of this kind being liable to injuries from floods and other casualties, provision was made for those repairs should they be necessary: and though the tenant, during the time necessary to make them, agreed to pay the rent provided the landlord proceeded to do the work in a reasonable time, he did so upon the assurance that his loss of the use would be but temporary, and that he would be compensated by future enjoyment. The burthen, during a temporary suspension, would be borne by each ; the tenant losing the rent and the landlord the cost of repairs. But if the landlord refused to make the “heavy repairs,” he was to lose the rent. This is a necessary implication from the words used; for it would have been idle to say he Avas not to lose the rent if he went on with the repairs, if the parties did not understand that his failure to make them should deprive him of the rent. And this conforms Avith the spirit and intention of the parties. As long as the tenant actually enjoyed or had the prospect of enjoying the thing, he was to pay rent; when the enjoyment ceased through the default of the landlord, the rent ceased. If this was the leading motive the parties, would it not defeat the great object they *603 had in view, to hold, that though rent should cease from the failure of the landlord to make “ heavy repairs,” because the tenant thereby was deprived of the temporary enjoyment of the thing; yet, when the property was destroyed, wholly depriving him of the use of the demised premises, and the landlord declined to repair, he should still pay rent ? This would indeed be to make a part greater than the whole. By a partial injury from hre, the burning of the main shaft for instance, the rent would be suspended, unless the landlord repaired; but if main shaft, building, dwelling house and all were consumed, the landlord was to be relieved from all charge, and the tenant be compelled to pay the whole rent. Such a construction, it strikes me, violates the whole scope and spirit of the contract. It looked to the enjoyment of the property by the tenant, and imposed upon the landlord the burden of making all such repairs as would be essential to such enjoyment. The classes enumerated are merely intended to discriminate the kind of repairs each was to make. And whenever it became necessary to make “ heavy repairs,” or, in the case which has occurred, to rebuild, so as to enable the tenant to use the thing rented, the landlord was bound to secure such enjoyment to the tenant, under the penalty of losing the rent.
Some weight has been attached to the use of the word repair, in this contract. It has been argued that the word implies the continued existence of the thing to be repaired, and that, therefore, the parties could not have looked to rebuilding, to the erection of a new mill, in the case of total destruction. I doubt whether the parties, to this inartificial contract, weighed with much nicety the true import of the words by which they have attempted to express their meaning. If we desired proof of this, the clause of their contract under consideration, furnishes it. It is provided, that “ if the main shaft or wheel should give way, so as to require a new one, in this case it is to *604 be repaired by the landlordhere, they use the word in a sense different from its literal meaning ; not to amend what exists, but to make something entirely new. Even if we were tied down to the strict meaning of the word, it would not vary the aspect of the case. The dam, as well as mills, were leased; all were parts of one whole; and though the house containing the machinery was consumed, the dam, foundation &c. remained, and the superstructure to be erected and attached to the remnants of what continued, may be included ha the meaning of the word “repair.” But looking at the spirit and intention of the contract, we are not driven to any such technical considerations.
In this view of the case, it becomes unnecessary to consider whether the contract bound the landlord to rebuild. At first, I felt inclined to the opinion that the stipulations of the agreement did amount to a covenant on his part to rebuild. But subsequent reflection has led me to doubt the correctness of this impression. Each party, by the contract, held his remedy in his own hands. The landlord was at liberty to repair or rebuild as he thought proper. By failing to do the work, he lost the rent; by going on, he maintained his right to it. And as the obligation of the tenant to pay the rent resulted from his ability to enjoy the thing, if, in the case contemplated, he could not, through the failure of the landlord, enjoy it, he was authorized to withhold the rent. In this view too, the court did not err in instructing the jury that the obligation to pay ceased from the time the mills were destroyed, the landlord having avowed his ■determination not to rebuild. For from that time the actual use of the thing by the tenant, and all prospect of future enjoyment, terminated.
As to the objection to Moore's testimony—the court below held, that it was legal evidence, and admitted it, but said it was a question for the jury, under the advice of the court if asked, how far it ought to avail. If the *605 testimony was offered to affect the construction of the written agreement, it would have been clearly inadmissible. But it does not appear that such was the object. The defendants had pleaded that the mills were burnt without default of the tenant: and from one of the instructions, asked for by the plaintiff, and given, it would seem that the point arose before the jury whether the mills were not burnt through the culpable negligence of the tenant. The jury was instructed that if the mills were burnt through his culpable negligence, then the tenant was bound to pay the rent. Upon this point the evidence was admissible, as tending to shew that the plaintiff, at one time, did not impute any negligence to the tenant. The motion went to reject the evidence altogether. The court was bound to overrule such an objection; and it does not appear that any motion was made to instruct the jury as to the effect of the evidence, although the court, in admitting it, intimated a willingness to instruct the jury as to its effect, if its opinion was asked.
Upon the whole, I think the judgment is right and should be affirmed.
Staxard, J. concurred.
Tucker, P.
In this case I have the misfortune to differ from my brethren upon the construction of the contract between the parties, though it is probable we may not differ materially as to the general principles of law which apply to cases of this description. I shall take it, therefore, as the general rule, both in equity and at law, that a tenant is not absolved from the payment of his rent by the accidental destruction of the premises by fire ; nor shall I think it necessary to establish the principle by authority, as the question in this case is supposed to turn, not so much on the general principle, as on the construction of the covenant in the lease. To this I shall therefore particularly address myself.
*606 And first, let me observe, that the stipulation in the contract (on the part of the landlord) to repair, can, by no fair interpretation, be construed to mean a covenant to rebuild. To rebuild is to reerect what has been destroyed: to repair is to mend or make good that which by wear and tear, or otherwise, has been impaired, or only partially destroyed, but which still has existence. To repair, and to rebuild, are not therefore convertible terms. It is an abuse of language so to consider them. We do. not repair-whsX is destroyed; we rebuild it. We do not rebuild what is partially injured or impaired ; we repair it: for to repair is to amend or restore to a good state after injury, decay or partial destruction. It implies the continued subsistence of the thing to be repaired. And as long as language shall give us distinct words for different ideas, it is wise to use them, and understand them, in their different senses. By confounding them, we shall confound also the meaning of contracts, and violate the intention of parties.
Oases, however, have been cited, where a party has been held to rebuild, though that term is not to be found in the contract. But in those cases, equivalent terms are found. As in the case of the bridge, (6 T. R. 750.) the workman covenanted to build it across a river, and to uphold and keep it in repair for seven years; and he was held bound to rebuild it when washed away. But there, not only did the nature of the engagement shew the intention of the parties that he should rebuild it, but the term uphold distinctly bound him to it. For the lexicographers tell us that to uphold is to maintain, to keep up, to continue in being, to support in any state ; so that the covenant was in effect to keep up the bridge, and continue it in the state in which it was, for seven years. So in Bullock v. Dommitt, the covenant was to repair, uphold, support, maintain &c. In Dyer 33. the covenant was to repair and sustain ; and the word “sustain" is italicised. In Com. Rep. 626. Chesterfield v. *607 Bolton, the covenant was to leave in repair; and in Brooke’s Abr. Cov. pl. 4. the case supposed is of a covenant to leave in the same plight. Now, all these imply, or mean expressly, that the tenant so covenanting shall rebuild. And the same may be said of Walton v. Waterhouse, 2 Saund. 420. where the words are “repair, uphold, support,' maintain and keep in repair as often as occasion shall require.” There is then no case in which to repair, standing alone, has been construed to mean rebuild.
The language of the covenant in this case is altogether different from the cases cited. Pendell engaged to keep up the repairs of the mill, except “ heavy repairs,” which are to be made by Thompson; and if I am not mistaken in the interpretation given to the term “repairs,” there is nothing in the contract which binds him to rebuild, or deprives him of his rent on his failure to rebuild in a reasonable time.
It is said, that as the contract provides, that the rent shall not be suspended where “ heavy repairs” are required, if Thompson should go on to do the work according to contract, it is implied, that it ■ shall be suspended if he does not. This I do not deny: but I cannot admit another deduction built upon it; that if the rent is to be suspended where there is partial injury, it must a fortiori be suspended, or totally lost to the landlord, where there is entire destruction. The law having established that the tenant shall not be absolved from rent by the destruction of the premises, unless it is so expressly provided by the contract, I cannot think that we are justified in interpolating such an exception into the contract for his benefit. It would indeed be the more unreasonable, since he has actually provided for the suspension of the rent in a particular case; that is to say, while the landlord delayed the repairs he was bound to make. Nay more ; with the very idea of “ accidents by fire and the act of God” in his mind, and *608 while he provides that he shall not be liable for them, he does not provide that his landlord shall be. How can we tell that the landlord would have assented to such a provision ? How can we say, that he was willing to relinquish the benefit of that legal principle, which secured to him his rent, even though the mill should be burned down ? How can we say, that he was willing to surrender this just and equitable principle which, in the absence of a contrary stipulation, distributes the loss upon the parties according to their respective interest,— the tenant losing his lease, the landlord his reversion ? How can we say, that Thompson would have been willing to be the insurer of the property during the continuance of the lease, without requiring additional rent to cover the hazard ? Above all, how can we infer his willingness to assent to a provision, which, in the event that the lease proved a losing bargain to Pendell, would be a premium for its destruction ? Shall we infer it by an argument a fortiori from the provision that the rent should be suspended in the event of Thompson delaying to do the “heavy repairs” when required? That provision was no premium for injury or negligence. If the shaft should give way and Thompson should immediately proceed to repair, the rent would, be going on, while the profits, only, would be suspended; and thus the tenant would have every motive to prevent those injuries, which would be more detrimental to him than to the landlord himself. But if the rent is to be suspended until the landlord shall enter upon the arduous and expensive duty of rebuilding, which it might not be his interest or within his power to undertake, the tenant might be absolved forever from an onerous contract, through his own negligence or perfidy. Such a construction I am not disposed to give to this contract. If the tenant desired to protect himself against the rent in case of fire, until the landlord should rebuild, he ought so to have provided. The provision is too momentous to be *609 taken by loose inference from less important stipulations. The less may often be inferred indeed from the greater; but it is I think against every principle of interpretation, to infer the greater from the less. Expressio unius ex-clusio est alterius, can never apply more strongly, than against such a construction. For it not only does not exclude what is not expressed, but it includes by inference, the greater in the less, contrary to the fair presumption, that if the greater had been intended it would have been mentioned rather than the less.
Judgment affirmed.